JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona 85007
Telephone: 602-382-2700

JEANETTE E. ALVARADO
Arizona Bar #016111
Asst. Federal Public Defender
Attorney for Defendant
jeanette_alvarado@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>vs.<br><br>James W. Clark,<br><br>    Defendant | No. CR-22-00889-PHX-MTL<br><br>**OBJECTIONS TO PSR:**<br>**U.S.S.G. §2A6.1:**<br>**Paragraphs 19 and 20** |

    Mr. Clark has pled guilty and should be punished for making an interstate threat, but not receive additional punishment for (1) engaging in any conduct to make good on his threat because no evidence exists that he did so, or (2) causing substantial disruption because of his threat, because though the threat disrupted the office's activities, no evidence shows it resulted in a substantial disruption.

    Mr. Clark objects to being assessed enhancements under U.S.S.G. §2A6.1, Threatening or Harassing Communications; Hoaxes; False Liens, and asks the Court to sustain his objections and find his final Offense Level, after acceptance of responsibility, is Offense Level 11[1].

---

[1] Final Offense Level 11 is calculated as follows: Base Offense Level 12, *minus* 4 levels from the application of U.S.S.G. §2A6.1(b)(6), *plus* 6 levels from the application of U.S.S.G. §3A1.2(a)(1), Official Victim, *minus* 3 levels from the application of U.S.S.G. §3E1.1(a), Acceptance of Responsibility.

1

**Timeline**

On February 14, 2021, at 9:52 pm, local Arizona time, Mr. Clark submitted a message via an online form on the *Secretary of State's* website that threatened an explosive device being detonated in that public official's personal space, if the *Attorney General* did not resign by February 16, 2021, at 9 a.m.

Computer records show that Mr. Clark was on the Secretary of State's website for three minutes from 9:48 pm to 9:51 pm.[2] Mr. Clark's crime of sending an interstate threat was complete once he pressed the send button to transmit the message to the Secretary of State's Office.

*After* the message was submitted, computer records showed Mr. Clark conducted an online search using the public official's name and "address" and "how to kill."

Records shows that Mr. Clark's message was not read by Secretary of State staff until after the purported February 16, 2021, 9 am deadline had passed[3].

**Application Notes to U.S.S.G. §2A6.1**

The application notes to U.S. Sentencing Guideline §2A6.1 wisely distinguishes between offenses that are only threats *versus* those where defendants have taken an extra step to carry out the threat.

> "These statutes cover a wide range of conduct, ***the seriousness of which depends upon the defendant's intent and the likelihood that the defendant would carry out the threat***. The specific offense characteristics are intended to distinguish such cases."

*See* U.S.S.G. §2A6.1, Application Note – Background (emphasis added).

---

[2] Government Discovery.
[3] Government Discovery, Pg 18.

**OBJECTION #1: ¶ 19, Conduct Evidencing an Intent to Carry Out Threat**

U.S.S.G. §2A6.1(b)(1) is inapplicable to Mr. Clark's threat. There are multiple reasons the six-levels assessed for this enhancement should be struck.

**1) Searching Terms "How to Kill" and "Address" After Threat was Sent is Outside the Temporal Scope of 2A6.1, Application Note 1**

First, U.S.S.G. §2A6.1, Application Note 1, limits the temporal scope of "conduct" to consider, when determining whether the enhancement applies:

> "In determining whether subsections (b)(1), (b)(2), and (b)(3) apply, the court shall consider both conduct that occurred *prior to* the offense and conduct that occurred *during* the offense…"

The evidence shows Mr. Clark's internet search at issue did not occur prior or during the offense, but *after* he submitted the threat through the online portal making his crime was complete.

The pre-sentence report writer's reason for applying the enhancement is that:

> *"on the same **date** the defendant submitted the threat, he conducted the online searches with the terms "'how to kill' and 'address…'"*

but fails to note the timing of those searches was *after* the threat was submitted.

**2) Internet Searches Alone Are Not Conduct, Without the Showing of an Actual Overt Act, Evidencing an Intent to Carry-Out The Threat**

Second, Mr. Clark's searches cannot be considered conduct under this guideline, without more, such as Mr. Clark planning to travel to the victim's location, attempting to obtain bomb-making materials, or coordinating with others to do so, and the like. No such evidence exists because other than sending the message through the online portal, Mr. Clark did nothing more.

At most, his subsequent internet searches show Mr. Clark's drunken curiosity in what the results would be of those search terms. However, curiosity

3

does not equal intent. And this enhancement is meant to punish those defendants taking that extra step. Such extra step must be more than conducting an online search that took no more than two minutes total[4] and is not of the type that shows any actual intent to carry out the acts being threatened, which here would have been the complex task of installing a bomb and detonating it.

The guideline's plain language and various circuits have held that for §2A6.1(b)(1) to apply, a defendant's conduct must be an "overt act" and that "overt act" must evince a "likelihood" the defendant will carry out the threat. *See U.S. v. Hines*, 26 F.3d 1469, 1473 (9th Cir. 1994)(enhancement's purpose is clear and applies to defendants who *act* on their threats because they are more dangerous and deserve more punishment; guideline should apply when conduct evidences defendant's intent and *likelihood* to carry out the threats); *U.S. v. Spencer*, 628 F.App'x 867 (4th Cir. 2015)( adjustment "hinges on the defendant's intent and the *likelihood* the defendant would carry out the threat").

Determining the "likelihood" of a defendant carrying out a threat is a direct function of a defendant's ability to carry it out and requires an inquiry into a defendant's ability to do so. This Court should consider what evidence exists that Mr. Clark would carry out the bomb threat:

- Did he have any technical knowledge or ability of bomb manufacturing?
- Did he attempt to or have any access to explosive materials?

This inquiry demonstrates the importance of assessing the risk level that Mr. Clark would do what he threatened. Defendants who make threats that create risk and fear should be sentenced more harshly than those whose threats create only

---

[4] Government Discovery shows searches occurred at 9:52pm and 9:53 pm.

fear. To make this important distinction, §2A6.1(b)(1) must be interpreted to distinguish between the risky threats from the riskless threats.

Failure to make this distinction impairs the Court's ability to sentence defendants in proportion to the degree of harm they caused. Courts can determine the severity of the threats by examining the defendant's intent and ability to carry them out, enabling courts to impose different sentences on two classes of threats: (1) those merely frightening versus (2) those that are both frightening and risky. This distinction is necessary and desirable.

Adding six levels to Mr. Clark's offense level for typing six words: the victims first and last name and terms "how to kill[5]" and "address[6]" would be a misapplication of this guideline meant to cover those planning to act on their threat.

<u>When the §2A6.1(b)(1) enhancement is upheld</u>, defendants clearly engaged in overt conduct evidencing their intent to follow through on their threats:

- *U.S. v. Hines*, 26 F.3d 1459 (9th Cir. 1994):
    - Defendant sent threatening letter about killing the President, said he had gotten within 30 feet of him with a gun in his pocket, and when arrested, had hunting knife, and the still desired to kill the President.

- *U.S. v. Wagoner*, 564 F. App'x 780 (6th Cir. 2014):
    - Defendant sent threatening message to Social Security Office and three days later approached a Social Security employee, with a bat in hand, telling the employee that if he didn't receive his social security check, he would do some damage.

---

[5] Running a search on: Victim's name and "how to kill" does not result in a "how-to'" of how to go through with that act. The results are of the victim and threats against her office, other articles about "killing" school vouchers, or other actions by her office.

[6] Running a search on: Victim's name and "address" does not result in the victim's personal address, but the governmental office. That same information was available on the message portal Mr. Clark accessed when he sent his message.

5

Where the §2A6.1(b)(1) six-level enhancement was deemed inapplicable:

- *U.S. v. Goynes*, 175 F.3d 350 (5th Cir. 1999):
    - Court held six-level enhancement inapplicable for defendant who sent harassing letters to judge and prosecutor, because although letters were threatening and one even signed in blood, they were merely threats and not overt acts evidencing an intent to carry out the threats.

**3) <u>Mr. Clark's Was in No Physical/Mental Condition To Carry-Out the Complex Task of Carrying Out the Threat to Install/Detonate a Bomb.</u>**

Third, the guideline is supposed to cover "**conduct** evidencing an '**intent**' to carry out such threat" and evidence shows that Mr. Clark's was under the influence of drugs and alcohol, when he committed the crime. He was drunkenly trolling the internet, sitting inside a room in his family member's home, binge drinking and using drugs every day, unemployed and feeling like a loser. He was some 2700 miles away from the Phoenix area, with little money to his name to undertake any travel, no plane tickets purchased, or road trips planned. And all he had was an old vehicle that would not have made the trip. He did not know how to make bombs, or have access to or possession of, any bomb making material. There is no evidence, because it does not exist, that Mr. Clark had a blueprint with plans on how to execute his drunken threat. Mr. Clark took no actions in the real world for the Court to conclude that these two searches are evidence he had the intent to carry out the threat. This six-level enhancement should not apply.

**A) Psychopharmacology Evaluation of Mr. Clark Supports Assertion that given Mr. Clark's substance abuse history, his claim to have been in a drunken/drugged out stupor when sending the threatening message, is supported.**

The defense will submit, under separate cover, an expert opinion about Mr. Clark's likely emotional and mental state at the time of the crime, given his poly-substance abuse history as verified by medical records from four facilities

6

(hospitals, in-patient facilities, and out-patient treatment programs) totaling more than1200 pages. The psychopharmacology evaluation conducted by Dr. James D. Stoehr, Ph.D., outlines Mr. Clark's alcohol and drug use at the time of the offense and lays out Dr. Stoehr's expert opinion regarding the cognitive, emotional, and behavioral effects of these psychoactive substances.

In sum, Dr. Stoehr states the quantity and types of substances Mr. Clark was using, significantly impaired his cognition (decision making, higher reasoning), emotional stability and behavioral control (impulsivity)[7]. Further, the quantity of alcohol he was drinking (daily binge drinking) affected his sensory functions, concentration, attention, reaction time, decision making, judgment, informational processing, and memory formation[8], up to the point of blackouts[9]. Dr. Stoehr stated that individuals experiencing such blackouts may remain conscious, engage in activities, and respond to stimuli, yet have no or very few subsequent memories of their behaviors [10].

Given his history, Mr. Clark was in no physical condition to carry out the additional steps of traveling from Boston to Phoenix to make his empty threat a reality and the typing of those additional terms, was nothing more than drunken internet trolling and not conduct evidencing an intent to carry out the threat.

4)   **Standard of Proof:  Clear and Convincing**

The standard of proof applicable to a relevant conduct determination is usually a preponderance of the evidence. *U.S. v Lonich*, 23 F.4th 881, 910 (9th Cir. 2022).  But, where a sentencing enhancement has an "extremely disproportionate

---

[7] *Sealed Filing*: Dr. Stoehr's Psychopharmacology Consultation, pg. 4.
[8] *Sealed Filing*: Dr. Stoehr's Psychopharmacology Consultation, pg. 8.
[9] *Sealed Filing*: Dr. Stoehr's Psychopharmacology Consultation, pg. 9.
[10] *Sealed Filing*: Dr. Stoehr's Psychopharmacology Consultation, pg. 10.

impact on the sentence, due process may require facts underlying a conviction be proven by clear and convincing evidence." *Id.,* 23 F.4th at 910; U.S. v. *Jordan*, 256 F.3d 922, 930 (9th Cir. 2001); *see also U.S. v. Lucas*, No. 22-50064, pg. 8 (9th Cir. June 14, 2023). To find an enhancement applicable at a clear and convincing standard, a judge must "have an abiding conviction that the truth of the factual contentions at issue is highly probable." *Lonich*, 23 F.4th at 916.

Determining whether an increase is disproportionate depends not just on the absolute increase, but on the totality of circumstances. *U.S. v. Zolp,* 479 F.3d 715, 718 (9th Cir. 2007)(clear and convincing evidence applied to loss calculations under 2B1.1); *U.S. v. Valle*, 904 F.3d 473 (9th Cir. 2019)(holding 4-level increase in a guideline calculation, resulting in nearly doubling a defendant's sentence, must be established by clear and convincing evidence).

Here is a comparison of Mr. Clark's sentencing range with and without the §2A6.1(b)(1) enhancement (not accounting for other possible enhancements):

**U.S.S.G. §2A6.1(b)(1)**

|  | Without | With |
|---|---|---|
| Base Offense Level | 12 | 12 |
| U.S.S.G. §2A6.1(b)(1) | +0 | +6 |
|  | 12 | 18 |
| With Criminal History I: | **10-18 months** | **27-33 months** |

Therefore, given that with the §2A6.1(b)(1) enhancement, Mr. Clark's sentence more than doubles in length, this Court must be satisfied, by clear and convincing standard, that Mr. Clark's two searches are overt acts of conduct showing he had the intent to commit the threat. Not only does this evidence not exist at a clear and convincing evidence standard, it does not exist at a

8

preponderance of the evidence standard either, because evidence shows Mr. Clark had no plans to do anything about his threat.

**OBJECTION #2: ¶20, Substantial Disruption-Public, Governmental Functions**

Defendants whose threats result in a substantial disruption of public, governmental or business functions receive a four-level increase to their offense level as the U.S.S.G. §2A6.1(b)(4) enhancement reads:

> If the offense resulted in (A) substantial disruption of public, governmental, or business functions or services; or (B) a substantial expenditure of funds to clean up, decontaminate, or otherwise respond to the offense.

Here, the evidence shows DPS conducted partial bomb sweeps of the Secretary of State's floor and another floor. There is no evidence showing the disruption was substantial and there is no indication that the duration of the evacuation was of a substantial length. Although the threat disrupted governmental functions, it did not do so at a substantial level as required to apply this four-level enhancement, because many staff were teleworking and not on-site at the Secretary of State's Office, only a partial evacuation was done of four to five employees, those employees did not get sent home for the day or even fully exited the building but went to other floors while the sweep was conducted. The bomb sweeps involved K9s and not more sophisticated assessment devices since Secretary of State staff informed officers there were no packages/items out of place in the office.

Staff members were interviewed regarding the threat and disruption and reported:

- FBI Interview of T.R:[11] T.R. recalled teleworking on that day. T.R. read the message first and forwarded it to a supervisor, R.F. There is no indication T.R.'s job tasks were disrupted that day.

- FBI Interview of K.L:[12] K.L. was not at the Secretary of State's office that day, but confirmed employees left the floor and DPS conducted a bomb sweep.

- FBI Interview of R.F.:[13] When first questioned about this bomb threat R.F. did not recall it. Agents refreshed her memory by having her read the message. R.F. could not remember if she was at the office that day because she mostly worked from home.

- FBI Interview of K.M.:[14] K.M. contacted DPS after being made aware of the message. He was teleworking but went into the office and met with the Secretary of State. DPS evacuated the floor the Secretary of State is on which had four to five employees on site, while DPS swept the floor.

- FBI Interview of Sgt. Curtin: DPS Sgt. Curtin responded to the threat and said the Governor's 9th floor was partially evacuated; however, the Governor and the rest of employees were told to shelter in place. Those who evacuated went to other floors and did not fully exit the building. The bomb sweep was conducted by K9s who swept the 9th floor and did a partial sweep of the Secretary of State's floor, because employees notified officers no packages or items seemed out of place. Sgt. Curtin opined these activities impacted business[15].

The dictionary defines "substantial" as "of ample or considerable amount, quantity, size, etc." *See* Random House Unabridged Dictionary (2nd ed. 1993). Synonyms for the word "substantial" are "excessive, tremendous, outsized, immense, massive". *See* Merriam-Webster Thesaurus at merriam-webster.com/thesaurus/substantial.

---

[11] Government Discovery, Pgs. 469-470.
[12] Government Discovery, Pgs. 474-475.
[13] Government Discovery, Pgs. 484.
[14] Government Discovery, Pgs. 546.
[15] Government Discovery, Pgs. 552.

10

Cases where U.S.S.G. §2A6.1(b)(4)'s "Substantial Disruption" enhancement has been applied:

- *U.S. v. Carter*, 651 F. App'x 474 (6th Cir. 2004):
    - Four-level enhancement applied when threatening letter sent to a government office containing a white powder, allegedly anthrax, which resulted in entire office shutting down from 10:30 a.m. through end of business, employees were prevented from entering the office and others were sent home. The staff member who opened the letter was placed under physical observation and a hazardous materials team had to inspect the premises.

- *U.S. v. Dudley*, 463 F.3d 1221, 1226 (11th Cir. 2012):
    - Four-level enhancement applied when a letter with white powder was received in a Judge's office, the staff member who opened the letter got covered in it. Suspecting it to be anthrax, the staff member was quarantined for several hours, and the judge was told to go home. Later the judge was given round-the-clock security. The Fire Department's hazardous materials team were called in and another floor of the courthouse was evacuated as was another judge's chambers and judicial business was halted for several hours in total.

- *U.S. v. Mohammed,* 459 F.3d 979 (9th Cir. 2006):
    - Defendant falsely claiming to be a former al Qaeda member said bomb attacks would take place in one week at several shopping malls near a Los Angeles federal building. Multiple law enforcement agencies were investigating and preventing the attack, to include FBI Terrorist Task Force, Los Angeles Police Department, Los Angeles County Sheriff's, Los Angeles Fire Department, California Highway Patrol, U.S. Border Patrol and Royal Canadian Police. The substantial disruption occurred at the affected shopping malls where sales dropped 65% to 85% during days of the threat.

Comparing the scope of the disruption caused by Mr. Clark's threat (partial evacuation, staff not leaving the building, many employees teleworking and not on site), with the magnitude of the disruption caused in the above cited cases, Mr.

11

Clark requests the Court not apply the four-level enhancement of §2A6.1(b)(4) because the objectively quantifiable evidence does not show, by clear and convincing evidence, the disruption was substantial. The clear and convincing evidence standard applies here because the difference in Mr. Clark's sentencing range with and without the §2A6.1(b)(4) enhancement (not accounting for other possible enhancements) is:

**U.S.S.G. §2A6.1(b)(4)**

|  | Without | With |
|---|---|---|
| Base Offense Level | 12 | 12 |
| U.S.S.G. §2A6.1(b)(4) | +0 | +4 |
|  | 12 | 16 |
| With Criminal History I: | **10-18 months** | **21-27 months** |

Given that with the §2A6.1(b)(1) enhancement, Mr. Clark's sentence more than doubles in length, this Court must be satisfied, by clear and convincing standard, that the impact on there exists objective evidence that the impact on the governmental office was substantial. The evidence does not show this, and it is requested this enhancement be struck.

**Objection #3: USSG §2A6.1(b)(6), Single Instance with Little/No Deliberation**

With both enhancements struck, the reduction of four levels afforded by U.S.S.G. §2A6.1(b)(6), should be applied:

> If (A) subsections (a)(2) and subdivisions (1), (2), (3), (4), and (5) do not apply and (B) involved a single instance evidencing little or no deliberation.

Here, given Mr. Clark's physical and mental state where he was in a drunk and drugged and trolling the internet, the limited time spent on the Secretary of State's website, the one minute he took to compose the message and commit this

12

crime, the fact he had no stake in the Arizona election, and the illogical content of the threat itself, this enhancement should be applied and Mr. Clark's final offense level, after acceptance of responsibility, should be at Offense Level 11.

**CONCLUSION**

Mr. Clark understands he sent a threatening message that created fear and that in his drunken and drugged state, he must have meant to cause fear, but he never had the subjective intent to follow-through on his threat. He was far away, with no ready ability or desire to travel to Arizona and no knowledge or access to bomb-making materials to make his empty threat come true. He asks the Court to sustain his objections.

Respectfully submitted: February 10, 2024.

JON M. SANDS
Federal Public Defender

 *s/Jeanette E. Alvarado*
JEANETTE E. ALVARADO
Asst. Federal Public Defender